FILED
CLERK, U.S. DISTRICT COURT

FEB - 5 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

1   Gideon Kracov (State Bar No. 179815)
2   LAW OFFICE OF GIDEON KRACOV
    801 S. Grand Avenue, 11th Floor
3   Los Angeles, CA 90017-4645
    Tel: (213) 629-2071
4   Fax: (213) 623-7755
    Email: gk@gideonlaw.net

5

6   Michael R. Lozeau (State Bar No. 142893)
    Richard T. Drury (State Bar No. 163559)
7   Douglas J. Chermak (State Bar No. 233382)
    LOZEAU DRURY LLP
8   410 12th Street, Suite 250
    Oakland, CA 94607
9   Tel: (510) 836-4200
    Fax: (510) 836-4205 (fax)
10  E-mail: michael@lozeaudrury.com
            richard@lozeaudrury.com
11          doug@lozeaudrury.com

12

13  Attorneys for Plaintiff
    CENTER FOR COMMUNITY ACTION
14  AND ENVIRONMENTAL JUSTICE

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17  CENTER FOR COMMUNITY           Case No. CV14-0230 VAP (SPx)
18  ACTION AND ENVIRONMENTAL
19  JUSTICE, a non-profit corporation,
20          Plaintiff,              COMPLAINT FOR DECLARATORY
                                    AND INJUNCTIVE RELIEF AND
21                                  CIVIL PENALTIES
22          vs.
23  RUUHWA DANN & ASSOCIATES,
24  INC. dba CAL MICRO RECYCLING,   (Federal Water Pollution Control Act,
                                    33 U.S.C. §§ 1251 to 1387)
25  a corporation,
26          Defendant.
27
28

COMPLAINT                            1

CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE ("CCAEJ"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On December 6, 2013, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct

COMPLAINT

1  copy of CCAEJ's notice letter is attached as Exhibit A, and is incorporated by

2  reference.

3       3.    More than sixty days have passed since notice was served on Defendant

4  and the State and federal agencies.  Plaintiff is informed and believes, and thereupon

5  

6  alleges, that neither the EPA nor the State of California has commenced or is

7  diligently prosecuting a court action to redress the violations alleged in this

8  

9  complaint.  This action's claim for civil penalties is not barred by any prior

10 administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

11 

12      4.    Venue is proper in the Central District of California pursuant to Section

13 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is

14 

15 located within this judicial district.

16 **II.   INTRODUCTION**

17 

18      5.    This complaint seeks relief for Defendant's discharges of polluted storm

19 water and non-storm water pollutants from Defendant RUUHWA DANN &

20 

21 ASSOCIATES, INC. dba CAL MICRO RECYCLING's recycling and scrap facility

22 located at 1541 West Brooks Street in Ontario, CA ("the Facility") in violation of the

23 

24 Act and  National Pollutant Discharge Elimination System ("NPDES") Permit No.

25 CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-

26 DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order

27 

28 No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's

COMPLAINT

violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

III. **PARTIES**

6.     Plaintiff CCAEJ is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California.  CCAEJ dedicated to working with communities to advocate for environmental justice and pollution prevention.  CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed.  To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.     CCAEJ has members living in the community adjacent to the Facility and the Santa Ana River Watershed.  They enjoy using the Santa Ana River for recreation and other activities.  Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CCAEJ use those areas to recreate and view wildlife, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by

COMPLAINT                                              4

Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.       Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

9.       Defendant RUUHWA DANN & ASSOCIATES, INC. dba CAL MICRO RECYCLING ("CAL MICRO" or "Defendant") is a corporation that owns and operates a recycling and scrap metal facility in Ontario, California.

## IV.   STATUTORY BACKGROUND

10.      Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.      Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving

COMPLAINT

Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement

COMPLAINT                                          7

site-specific best management practices ("BMPs") to reduce or prevent pollutants

associated with industrial activities in storm water and authorized non-storm water

discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT

(Section B(3)).  The SWPPP must include: a description of individuals and their

responsibilities for developing and implementing the SWPPP (Section A(3)); a site

map showing the facility boundaries, storm water drainage areas with flow pattern

and nearby water bodies, the location of the storm water collection, conveyance and

discharge system, structural control measures, impervious areas, areas of actual and

potential pollutant contact, and areas of industrial activity (Section A(4)); a list of

significant materials handled and stored at the site (Section A(5)); a description of

potential pollutant sources including industrial processes, material handling and

storage areas, dust and particulate generating activities, and a description of

significant spills and leaks, a list of all non-storm water discharges and their sources,

and a description of locations where soil erosion may occur (Section A(6)).  The

SWPPP must include an assessment of potential pollutant sources at the Facility and

a description of the BMPs to be implemented at the Facility that will reduce or

prevent pollutants in storm water discharges and authorized non-storm water

discharges, including structural BMPs where non-structural BMPs are not effective

(Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must

be revised where necessary (Sections A(9), (10)).

COMPLAINT

18.    Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

19.    The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

20.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples

COMPLAINT                                                  9

during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample...facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

21.    The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described.  This shall include the source, quantity, frequency, and characteristics of the non-

storm water discharges and associated drainage area." Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that best management practices ("BMPs") are included in the Storm Water Pollution Prevention Plan to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

22.    Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water

including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Santa Ana River for contact and non-contact water recreation.

26.     The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *Id.* at 4-18.

27.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses." *Id.* at 4-15.

28.     The Basin Plan includes a narrative suspended and settleable solids standard which states that "waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses . . . ." *Id.* at 4-16.

29.     The Basin Plan includes a narrative floatables standard which states that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses." *Id.* at 4-11.

30.     The Basin Plan includes a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses." *Id.* at 4-10.

31.     The Basin Plan includes a narrative turbidity standard which states that

"inland surface waters . . . shall be free of changes in turbidity which adversely affect beneficial uses. *Id.* at 4-18.

32.   The Basin Plan sets out a number of numeric water quality standards. The Basin Plan includes Site Specific Objective standards (hereinafter "SSOs") of 0.0017 mg/L for cadmium, 0.0182 mg/L for copper, and 0.0041 mg/L for lead.[1]   *Id.* at 4-14.

33.   The Basin Plan includes a pH standard of 6.5 – 8.5 standard units (hereinafter "s.u."). *Id.* at 4-15.

34.   The Basin Plan includes a nitrate standard of 10 mg/L. *Id.* at 4-14.

35.   The Basin Plan also sets out additional numeric water quality standards for Chino Creek, which the Facility's discharge flows through.  In particular, the Basin Plan sets numeric water quality objectives of 550 mg/L for total dissolved solids, 240 mg/L for hardness, 75 mg/L for sodium, 75 mg/L for chloride, 8 mg/L for total inorganic nitrogen, 60 mg/L for sulfate, and 15 mg/L for chemical oxygen demand.

36.   EPA has promulgated the California Toxics Rule (hereinafter "CTR"), establishing freshwater numeric water quality standards known as Criteria Maximum Concentration (hereinafter "CMC") and Criteria Continuous Concentration

---

[1] The values for cadmium, copper and lead are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 200 mg/L.

(hereinafter "CCC") for zinc of 0.120 mg/L (CMC and CCC); copper of 0.009 mg/L (CMC) and 0.013 mg/L (CCC); and for lead of 0.065 mg/L (CMC) and 0.0025 mg/L (CCC).  40 C.F.R. § 131.38.[2]

37.   The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable (hereinafter "BAT") and best conventional pollutant control technology (hereinafter "BCT").  The following benchmarks have been established for pollutants discharged by CAL MICRO: Chemical Oxygen Demand ("COD") – 120 mg/L, Total Suspended Solids ("TSS") – 100 mg/L, Total Organic Carbon ("TOC") – 100 mg/L, Aluminum – 0.75 mg/L, Copper – 0.0156 mg/L, Iron – 1.0 mg/L, Lead – 0.095 mg/L, and Total Zinc – 0.13 mg/L.[3]  U.S. Environmental Protection Agency, Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (2009) 52, 102 (hereinafter "MSGP").

38.   Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33

---

[2] The values for zinc, copper, and lead are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L.

U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.   STATEMENT OF FACTS

39.   On April 1, 2009, CAL MICRO filed a Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity (hereinafter "NOI").  In its NOI, CAL MICRO has certified that the Facility is classified under SIC Codes 2821 (Plastics Materials, Synthetic Resins, and Nonvulcanized Elastomers), 4952 (Sewerage Systems) and 5093 (Scrap and Waste Materials).  The majority of the Facility is paved and used for processing, shredding, and storing electronics, plastics, metals, and fibers. On information and belief, Plaintiff alleges that there is at least one large building located on the property. Plaintiff is informed and believes, and thereupon alleges that processing and shredding is conducted both inside and outside of this building.

40.   The Facility collects and discharges storm water from its industrial site into one or more storm drain outfalls located at the Facility.  The outfalls discharge into San Bernardino County's municipal storm sewer system, which flows into Chino

---

[3] *Id.*

COMPLAINT

Creek which flows into the Santa Ana River.

41.     On information and belief, Plaintiff alleges that significant activities at the site take place outside and are exposed to rainfall.  These activities include the processing, shredding, and storing electronics, plastics, metals, and fibers.  Loading and delivery of materials occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  These areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms, and other storm water controls.

42.     Industrial machinery, heavy equipment and vehicles, including trucks, trailers, and forklifts are operated at the Facility in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, coolant, and hydraulic fluids that are exposed to storm water flows, and that such machinery and equipment track sediment and other contaminants throughout the Facility.  On information and belief, Plaintiff alleges that trucks leaving the Facility track substantial amounts of material onto adjoining public roads.  On information and belief, Plaintiff alleges that during rain events, material that has been tracked from the Facility onto public roads during dry weather is transported via storm water to storm drain channels.

43.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of the Facility, collecting suspended sediment,

dirt, oils, grease, and other pollutants as it flows toward the storm water drains. Storm water and any pollutants contained in that storm water entering the drains flows directly to the Facility's outfalls which discharge to San Bernardino County's municipal storm sewer system, which flows into Chino Creek which flows into the Santa Ana River.

44.    The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.  The Facility lacks controls to prevent the tracking and flow of pollutants onto adjacent public roads.

45.    Since at least December 30, 2009, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board.  Defendant CAL MICRO certified each of those annual reports pursuant to Sections A and C of the General Permit.

COMPLAINT                                        18

46.     Since at least December 30, 2009, the Facility has detected TSS and TOC in storm water discharged from the Facility.  Since at least February 5, 2010, the Facility has detected copper, lead, zinc, iron, aluminum, and COD in storm water discharged from the Facility.  Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in the Facility's storm water have exceeded the parameters for water quality standards in the Basin Plan and the CTR.

47.     The following discharges of pollutants from the Facility contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan or the CTR, as well as narrative water quality standards in the Bain Plan, evidencing past and ongoing violations of General Permit Discharge Prohibitions A(1) and A(2), Effluent Limitation B(3) and Receiving Water Limitations C(1) and C(2).

| Date | Parameter | Observed Concentration | Basin Plan or EPA Water Quality Standard | Outfall (as identified by the Facility) |
|------|-----------|------------------------|------------------------------------------|------------------------------------------|
| 2/8/2013 | Chemical Oxygen Demand | 388 mg/L | 15 mg/L | South Outfall |

| 12/12/2011 | Chemical Oxygen Demand | 354 mg/L | 15 mg/L | South Outfall |
| 10/5/2011 | Chemical Oxygen Demand | 1170 mg/L | 15 mg/L | South Outfall |
| 2/8/2013 | Copper | 0.085 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 12/12/2011 | Copper | 0.06 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 10/5/2011 | Copper | 0.185 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 2/5/2010 | Copper | 0.123 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 2/8/2013 | Lead | 0.248 mg/L | 0.0041 mg/L; 0.095 mg/L; 0.065 mg/L (CMC); 0.0025 mg/L (CCC) | South Outfall |

COMPLAINT

| 12/12/2011 | Lead | 0.044 mg/L | 0.0041 mg/L; 0.025 mg/L (CCC) | South Outfall |
|---|---|---|---|---|
| 10/5/2011 | Lead | 0.148 mg/L | 0.0041 mg/L; 0.095 mg/L; 0.065 mg/L (CMC); 0.0025 mg/L (CCC) | South Outfall |
| 2/5/2010 | Lead | 0.018 mg/L | 0.0041 mg/L; 0.0025 mg/L (CCC) | South Outfall |
| 2/8/2013 | Zinc | 1.06 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 12/12/2011 | Zinc | 0.84 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 10/5/2011 | Zinc | 3.14 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 2/5/2010 | Zinc | 0.513 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 2/8/2013 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 1/10/2013 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/26/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |

COMPLAINT

| 12/24/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
|---|---|---|---|---|
| 12/18/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/17/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 12/13/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/3/2012 | Narrative | Yellowish | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/29/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/9/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 2/15/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |

COMPLAINT

| | | | | |
|---|---|---|---|---|
| 12/12/2011 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/4/2011 | Narrative | Yellowish hue | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 10/5/2011 | Narrative | Oily | Oil & Grease (Basin Plan at 4-18) | South Outfall |
| 2/5/2010 | Narrative | Discoloration | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 12/30/2009 | Narrative | Discoloration | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |

48.    The level of TSS in storm water measured by Defendant has exceeded the benchmark value for TSS of 100 mg/L established by EPA.  For example, on February 8, 2013, the level of TSS measured by Defendant was 195 mg/L.  That level of TSS is almost twice the benchmark value for TSS.  CAL MICRO also measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on October 5, 2011.

49.     The level of TOC in storm water measured by Defendant has exceeded the benchmark value for TOC of 110 mg/L established by EPA.  On October 5, 2011, the level of TOC measured by Defendant was 235 mg/L.  That level of TOC is over twice the benchmark value for TOC.

50.     The levels of COD in storm water measured by Defendant have exceeded the water quality standard for COD established in the Basin Plan.  For example, on October 5, 2011, the level of COD measured from the Facility was 1170 mg/L.  That level of COD is 78 times the water quality standard for COD.

51.     The levels of COD in storm water measured by Defendant has exceeded the benchmark value for COD of 120 mg/L established by EPA.  For example, on October 5, 2011, the level of COD measured by Defendant was 1,170 mg/L.  That level of COD is almost 11 times the benchmark value for COD.  Defendant also has measured levels of COD in storm water discharged from the Facility in excess of EPA's benchmark value of 120 mg/L in nearly every other storm water sample it has taken for the past five years, including February 8, 2013, and December 12, 2011.

52.     The levels of copper in storm water measured by Defendant have exceeded the freshwater numeric water quality standards for copper of 0.009 mg/L (CCC) and 0.013 mg/L (CMC) established by the EPA, as well as the SSO for copper of 0.0182 mg/L established in the Basin Plan.  For example, on October 5, 2011, the level of copper measured from the Facility was 0.185 mg/L.  That level of copper is

over 20 times the CCC for copper, over 14 times the CMC for copper, and over 10 times the SSO for copper.

53.     The level of copper in storm water measured by Defendant has exceeded the benchmark value for copper of 0.0156 mg/L established by EPA.  For example, on October 5, 2011, the level of copper measured by Defendant from the Facility was 0.185 mg/L.  That level of copper is almost 12 times the benchmark value for copper. Defendant also has measured levels of copper in storm water discharged from the Facility in excess of EPA's benchmark value of 0.0156 mg/L in every other storm water sample it has taken for the past five years, including February 8, 2013; December 12, 2011; and February 5, 2010.

54.     The levels of lead in storm water measured by Defendant have exceeded the freshwater numeric water quality standards for lead of 0.0025 mg/L (CCC) and 0.065 mg/L (CMC) established by the EPA, as well as the SSO for lead of 0.0041 mg/L established in the Basin Plan.  For example, on February 8, 2013, the level of lead measured from the Facility was 0.248 mg/L.  That level of lead is over 99 times the CCC for lead, almost 4 times the CMC for lead, and over 60 times the SSO for lead.

55.     The level of lead in storm water detected by Defendant has exceeded the benchmark value for lead of 0.095 mg/L established by EPA.  For example, on February 8, 2013, the level of lead measured by Defendant from the Facility was

0.248 mg/L.  That level of lead is over 2.5 times the benchmark value for lead.

Defendant also measured levels of lead in storm water discharged from the Facility in

excess of EPA's benchmark value of 0.095 mg/L on October 5, 2011.

56.     The levels of zinc in storm water measured by Defendant have exceeded

the freshwater numeric water quality standards of 0.12 mg/L for zinc (CMC and

CCC) established by the EPA.  For example, on October 5, 2011, the level of zinc

measured from the Facility was 3.14 mg/L.  That level of zinc is over 26 times both

the CMC and CCC for zinc.

57.     The level of zinc in storm water measured by Defendant has exceeded

the benchmark value for zinc of 0.13 mg/L established by EPA.  For example, on

October 5, 2011, the level of zinc measured by Defendant was 3.14 mg/L.  That level

of zinc is over 24 times the benchmark value for zinc.  Defendant also has measured

levels of zinc in storm water discharged from the Facility in excess of EPA's

benchmark value of 0.13 mg/L in every other storm water sample it has taken for the

past five years, including February 8, 2013; December 12, 2011; and February 5,

2010.

58.     The level of iron in storm water measured by Defendant has exceeded

the benchmark value for iron of 1 mg/L established by EPA.  For example, on

October 5, 2011, the level of iron measured by Defendant from the Facility was 6.31

mg/L.  That level of iron is over 6 times the benchmark value for iron.  Defendant

also has measured levels of iron in storm water discharged from the Facility in excess of EPA's benchmark value of 1 mg/L in nearly every other storm water sample it has taken for the past five years, including February 8, 2013, and December 12, 2011.

59.     The level of aluminum in storm water measured by Defendant has exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on February 8, 2013, the level of aluminum measured by Defendant from the Facility was 4.78 mg/L.  That level of aluminum is almost 6.5 times the benchmark value for aluminum.  Defendant also has measured levels of aluminum in storm water discharged from the Facility in excess of EPA's benchmark value of 0.75 mg/L in every other storm water sample it has taken for the past five years, including December 12, 2011; October 5, 2011; and February 5, 2010.

60.     On information and belief, CCAEJ's investigation of the CAL MICRO's monitoring data indicates that it failed to analyze for Copper, Lead, Zinc, Iron, Aluminum, Chemical Oxygen Demand, and pH during the 2009-2010 wet season.

61.     On information and belief, CCAEJ's investigation, including its review of CAL MICRO's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards and the EPA's benchmark values, indicate that CAL MICRO has not implemented BAT and BCT at the facility for its discharges of aluminum, chemical oxygen demand, copper, iron, lead, total organic carbon, total suspended solids, inc, , and other pollutants

affecting color and turbidity in violation of water quality standards and Effluent Limitation B(3) of the General Permit.  CAL MICRO was required to have implemented BAT and BCT by no later than October 1, 1992, or since the date the Facility opened.  Thus CAL MICRO is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.  On information and belief, as of the date of this Complaint, Defendant has failed to implement BAT and BCT.

62.     On information and belief, Plaintiff alleges that since at least December 7, 2008, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or an adequate description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CCAEJ, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges,

that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

63.     CCAEJ's investigation of the conditions at the Facility as well as the City of Ontario's Stormwater Program Inspection Reports indicates that CAL MICRO has consistently failed to implement BMPs adopted as part of the SWPPP. Inspections by the City of Ontario shows that CAL MICRO has failed to implement both non-structural and structural BMPs that are outlined in its SWPPP, including sweeping of trash and debris and installation of storm water treatment controls.  City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Jan. 3, 2013); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Sept. 19 2011); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Oct. 25, 2010); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Dec. 11, 2009).

64.     Information available to CCAEJ indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to the County of San Bernardino storm drain system, which discharges to the Chino Creek, Santa Ana River.

65.     Plaintiff is informed and believes, and thereupon alleges, that, Defendant

has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

66.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least December 7, 2008.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

67.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

68.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

69.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of aluminum, chemical oxygen demand, copper, iron, lead, total organic carbon, total suspended solids, zinc, and other pollutants affecting color and turbidity in violation of Effluent Limitation B(3) of the General Permit.

70.     Each day since December 7, 2008, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

71.     Defendant has been in violation of the BAT/BCT requirements every day since December 7, 2008.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

72.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

COMPLAINT                                         31

fully set forth herein.

73.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

74.    Plaintiff is informed and believes, and thereupon alleges, that since at least December 7, 2008, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

75.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with aluminum, chemical oxygen demand, copper, iron, lead, total organic carbon, total suspended solids, zinc, floating and suspended materials, discoloration, oil, grease, and other un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated from the Facility into the County of San Bernardino' storm drain system, which discharges to the Chino

Creek and then into the Santa Ana River.

76.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

77.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

78.   Every day since at least December 7, 2008, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

79.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

80.   Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

COMPLAINT                                          33

81.   Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia,* Defendant's outdoor storage of various materials without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation of vehicles at the site, including trucks and forklifts; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and water quality standards.

82.   Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

83.   Each day since December 7, 2008, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

84.   Defendant has been in violation of the SWPPP requirements every day since December 7, 2008.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

## FOURTH CAUSE OF ACTION
### Failure to Develop and Implement an

**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

85.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

86.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

87.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to analyze its storm water discharges for copper, lead, zinc, iron, aluminum, chemical oxygen demand, and pH during the 2009-2010 wet season.

88.     Each day since December 7, 2008, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

89.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

90.   Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 30, 2010.

91.   Each day since at least June 30, 2010, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT

COMPLAINT                                             36

and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

        e.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

        f.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

        g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

        h.  Order Defendant to pay civil penalties of $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

        i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

        j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

COMPLAINT

1          k.  Award any such other and further relief as this Court may deem

2   appropriate.

3

4

5   Dated: February 5, 2014        Respectfully submitted,

6                              LAW OFFICE OF GIDEON KRACOV

7                              By:  _____

8                              Gideon Kracov
                           Attorneys for Plaintiff

9

10                             CENTER FOR COMMUNITY ACTION AND
                           ENVIRONMENTAL JUSTICE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                          38

# EXHIBIT A

# GIDEON KRACOV

Attorney at Law

801 South Grand Avenue
11th Floor
Los Angeles, California 90017

(213) 629-2071
Fax: (213) 623-7755

gk@gideonlaw.net
www.gideonlaw.net

December 6, 2013

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Ruuhwa Dann, President & Registered Agent
Mike Easterbrook, Chief Compliance Officer
Puneet Gupta, Regulatory Affairs Specialist
Ruuhwa Dann & Associates, Inc.
DBA Cal Micro Recycling
1541 West Brooks Street
Ontario, CA 91762

Ruuhwa Dann, President & Registered Agent
Mike Easterbrook, Chief Compliance Officer
Puneet Gupta, Regulatory Affairs Specialist
Ruuhwa Dann & Associates, Inc.
DBA Cal Micro Recycling
1515 West Holt Boulevard
Ontario, CA 91762

RE:     **Notice Of Violations And Intent To File Suit Under The Federal Water
Pollution Control Act Concerning Cal Micro Recycling, 1525 and 1541 West
Brook Street, Ontario, California, WDID No. 8 361022093**

Dear Messrs. Dann, Easterbrook, Gupta,

The Law Office of Gideon Kracov (hereinafter "**Office**") on behalf of the Center for
Community Action and Environmental Justice (hereinafter "**CCAEJ**") is contacting you
concerning Clean Water Act (hereinafter "**CWA**" or "**Act**") violations at Cal Micro Recycling's
facility at 1525 and 1541 West Brooks Street, Ontario, California (hereinafter "**Facility**").

This letter is being sent to you, Mike Easterbrook, Ruuhwa Dann, Puneet Gupta, Cal
Micro Recycling, and Ruuhwa Dann & Associates, Inc., as the responsible owners, officers, or
operators of the Facility (collectively hereinafter "**Cal Micro**").

CCAEJ is a non-profit public benefit corporation dedicated to working with communities
to advocate for environmental justice and pollution prevention.  CCAEJ has members living in

the community adjacent to the Facility and the Santa Ana River Watershed.  CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed.

This letter addresses Cal Micro' unlawful discharge of pollutants from the Facility through the San Bernardino County municipal storm sewer system to the State Street Channel which flows into Brooks Basin, San Antonio Channel, Chino Creek and into the Santa Ana River. The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System (hereinafter "NPDES") Permit No. CA S000001, California State Water Resources Control Board (hereinafter "State Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").  The WDID identification number for the Facility listed on documents submitted to the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board") is 8 36I022093.  The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the CWA requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency (hereinafter "EPA"), and the State in which the violations occur.

As required by the Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, Cal Micro is hereby placed on formal notice by CCAEJ that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CCAEJ intends to file suit in federal court against Cal Micro under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the CWA and General Permit.  These violations are described more extensively below.

## I.   BACKGROUND.

On April 1, 2009 Cal Micro filed a Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity (hereinafter "NOI").  In its NOI, Cal Micro has certified that the Facility is classified under SIC Codes 2821 (Plastics Materials, Synthetic Resins, and Nonvulcanized Elastomers), 4952 (Sewerage Systems) and 5093 (Scrap and Waste Materials).  The Facility collects and discharges storm water from its industrial site into one or more storm drain outfalls located at the Facility.  The outfalls discharge into San Bernardino County's municipal storm sewer system, which flows into Chino Creek which flows into the Santa Ana River.

The Regional Board has identified beneficial uses of the Santa Ana River Watershed and established water quality standards for the river and its tributaries in "The Water Quality Control

Plan (Basin Plan) for the Santa Ana River Basin" (hereinafter "**Basin Plan**"). *See* California
Regional Water Quality Control Board, Santa Ana Region, The Water Quality Control Plan
(Basin Plan) for the Santa Ana River Basin (2011), *available at* http://www.swrcb.ca.gov/
rwqcb8/water_issues/programs/basin_plan/index.shtml.

    The beneficial uses of these waters include, among others, municipal and domestic
supply, agricultural supply, groundwater recharge, water contact recreation, non-contact water
recreation, warm freshwater habitat, cold freshwater habitat, and wildlife habitat. The non-
contact water recreation use is defined as "[u]ses of water for recreational activities involving
proximity to water, but not normally involving contact with water where water ingestion is
reasonably possible." *Id.* at 3-3. These uses include, but are not limited to, picnicking,
sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting,
sightseeing, or aesthetic enjoyment in conjunction with the above activities." *Id.* Contact
recreation use includes fishing and wading. *Id.* at 3-2. Visible pollution, including visible
sheens and cloudy or muddy water from industrial areas, impairs people's use of the Santa Ana
River for contact and non-contact water recreation.

    The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances
shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are
harmful to human health." *Id.* at 4-18. The Basin Plan includes a narrative oil and grease
standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or
other material in concentrations which result in a visible film or in coating objects in the water,
or which cause a nuisance or adversely affect beneficial uses." *Id.* at 4-15. The Basin Plan
includes a narrative suspended and settleable solids standard which states that "waters shall not
contain suspended or settleable solids in amounts which cause a nuisance or adversely affect
beneficial uses . . . ." *Id.* at 4-16. The Basin Plan includes a narrative floatables standard which
states that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam
or scum, which cause a nuisance or adversely affect beneficial uses." *Id.* at 4-11. The Basin
Plan includes a narrative color standard which states that "[w]aste discharges shall not result in
coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses."
*Id.* at 4-10. The Basin Plan includes a narrative turbidity standard which states that "inland
surface waters . . . shall be free of changes in turbidity which adversely affect beneficial uses. *Id.*
at 4-18.

    Moreover, the Basin Plan sets out a number of numeric water quality standards. The
Basin Plan includes Site Specific Objective standards (hereinafter "**SSOs**") of 0.0017 mg/L for
cadmium, 0.0182 mg/L for copper, and 0.0041 mg/L for lead.[1] *Id.* at 4-14. The Basin Plan

---

[1] The values for cadmium, copper and lead are expressed as a function of total hardness (mg/L)
in the water body and correspond to a total hardness of 200 mg/L.

includes a pH standard of 6.5 – 8.5 standard units (hereinafter "**s.u.**"). *Id.* at 4-15. The Basin Plan includes a Nitrate standard of 10 mg/L. *Id.* at 4-14.

The Basin Plan also sets out additional numeric water quality standards for Chino Creek, which the Facility's discharge flows through. In particular, the Basin Plan sets numeric water quality objectives of 550 mg/L for total dissolved solids, 240 mg/L for hardness, 75 mg/L for sodium, 75 mg/L for chloride, 8 mg/L for total inorganic nitrogen, 60 mg/L for sulfate, and 15 mg/L for chemical oxygen demand.

EPA has promulgated the California Toxics Rule (hereinafter "**CTR**"), establishing freshwater numeric water quality standards known as Criteria Maximum Concentration (hereinafter "**CMC**") and Criteria Continuous Concentration (hereinafter "**CCC**") for zinc of 0.120 mg/L (CMC and CCC); copper of 0.009 mg/L (CMC) and 0.013 mg/L (CCC); and for lead of 0.065 mg/L (CMC) and 0.0025 mg/L (CCC). 40 C.F.R. § 131.38.[2]

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable (hereinafter "**BAT**") and best conventional pollutant control technology (hereinafter "**BCT**"). The following benchmarks have been established for pollutants discharged by Cal Micro: Chemical Oxygen Demand – 120 mg/L, Total Suspended Solids – 100 mg/L, Aluminum 0.75 mg/L, Copper 0.0156 mg/L, Iron 1.0 mg/L, Lead – 0.095 mg/L, and Total Zinc – 0.13 mg/L.[3] U.S. Environmental Protection Agency, Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (2009) 52, 102 (hereinafter "**MSGP**").

## II.   ALLEGED VIOLATIONS OF THE NPDES PERMIT.

### a.   Discharges In Violation Of The Permit Not Subjected To BAT/BCT.

Cal Micro has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants

---

[2] The values for zinc, copper, and lead are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L.
[3] *Id.*

are Total Suspended Solids, Oil and Grease, pH, Biochemical Oxygen Demand, and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.* §§ 401.15, 401.16.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2). As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

Cal Micro has discharged and continues to discharge storm water with unacceptable levels of copper, lead, zinc, total organic compounds, iron, aluminum, chemical oxygen demand, oil & grease, total suspended solids and other pollutants in violation of the General Permit. Cal Micro' sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan or the CTR, evidencing past and ongoing violations of General Permit Discharge Prohibitions A(1) and A(2), Effluent Limitation B(3) and Receiving Water Limitations C(1) and C(2).

| Date | Parameter | Observed Concentration | Basin Plan or EPA Water Quality Standard | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 2/8/2013 | Chemical Oxygen Demand | 388 mg/L | 15 mg/L | South Outfall |
| 12/12/2011 | Chemical Oxygen Demand | 354 mg/L | 15 mg/L | South Outfall |

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page **6 of 15**

| 10/5/2011 | Chemical Oxygen Demand | 1170 mg/L | 15 mg/L | South Outfall |
|---|---|---|---|---|
| 2/8/2013 | Copper | 0.085 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 12/12/2011 | Copper | 0.06 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 10/5/2011 | Copper | 0.185 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 2/5/2010 | Copper | 0.123 mg/L | 0.0182 mg/L; 0.009 mg/L (CMC); 0.013 mg/L (CCC) | South Outfall |
| 2/8/2013 | Lead | 0.248 mg/L | 0.0041 mg/L; 0.095 mg/L; 0.065 mg/L (CMC); 0.025 mg/L (CCC) | South Outfall |
| 12/12/2011 | Lead | 0.044 mg/L | 0.0041 mg/L; 0.025 mg/L (CCC) | South Outfall |
| 10/5/2011 | Lead | 0.148 mg/L | 0.0041 mg/L; 0.095 mg/L; 0.065 mg/L (CMC); 0.025 mg/L (CCC) | South Outfall |
| 2/5/2010 | Lead | 0.018 mg/L | 0.0041 mg/L | South Outfall |
| 2/8/2013 | Zinc | 1.06 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 12/12/2011 | Zinc | 0.84 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 10/5/2011 | Zinc | 3.14 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 2/5/2010 | Zinc | 0.513 mg/L | 0.12 mg/L (CMC and CCC) | South Outfall |
| 2/8/2013 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 1/10/2013 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page 7 of 15

| 12/26/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/24/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 12/18/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/17/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 12/13/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/3/2012 | Narrative | Yellowish | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/29/2012 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/9/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 2/15/2012 | Narrative | Oily | Oil & Grease (Basin Plan at 4-15) | South Outfall |
| 12/12/2011 | Narrative | Muddy | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 11/4/2011 | Narrative | Yellowish hue | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 10/5/2011 | Narrative | Oily | Oil & Grease (Basin Plan at 4-18) | South Outfall |
| 2/5/2010 | Narrative | Discoloration | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |
| 12/30/2009 | Narrative | Discoloration | Color (Basin Plan at 4-10); Turbidity (Basin Plan at 4-18) | South Outfall |

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page 8 of 15

The information in the above table reflects data gathered from Cal Micro's self-monitoring during the 2008-2009, 2009-2010, 2010-2011, 2011-2012 and 2012-2013 wet seasons. CCAEJ alleges that during each of these wet seasons and continuing through today, Cal Micro has discharged storm water contaminated with pollutants at levels or observations that exceed or violate one or more applicable water quality standards, including, but not limited to, each of the following:

- Chemical Oxygen Demand – 15 mg/L, Basin Plan at 4-42, tbl. 4-1;

- Color – "Water discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses," *id.* at 4-10;

- Copper – 0.0182 mg/L, *id.* at 4-14;

- Copper – 0.009 mg/L (CMC), 40 C.F.R. § 131.38;

- Copper – 0.013 mg/L (CCC), *id.*;

- Lead – 0.0041 mg/L, Basin Plan at 4-14;

- Lead – 0.065 mg/L (CMC), 40 C.F.R. § 131.38;

- Lead – 0.025 mg/L (CCC), *id.*;

- Oil and Grease – "Waste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses," Basin Plan at 4-15;

- Turbidity – "All inland surface waters of the region shall be free of changes in turbidity which adversely affect beneficial uses," *id.* at 4-18; and

- Zinc – 0.12 mg/L (CMC and CCC), 40 C.F.R. § 131.38

The following discharges of pollutants from the Facility contained concentrations of pollutants in excess of numeric water quality benchmarks established by EPA in the MGSP ("**EPA Benchmarks**"), evidencing past and ongoing violations of General Permit Discharge Prohibitions A(1) and A(2), Effluent Limitation B(3) and Receiving Water Limitations C(1) and C(2).

/ / /

/ / /

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page 9 of 15

| Date | Parameter | Observed Concentration | EPA Benchmarks | Location (as identified by the Facility) |
|---|---|---|---|---|
| 2/8/2013 | Aluminum | 4.78 mg/L | 0.75 mg/L | South Outfall |
| 12/12/2011 | Aluminum | 1.5 mg/L | 0.75 mg/L | South Outfall |
| 10/5/2011 | Aluminum | 3.5 mg/L | 0.75 mg/L | South Outfall |
| 2/5/2010 | Aluminum | 4.08 mg/L | 0.75 mg/L | South Outfall |
| 2/8/2013 | Chemical Oxygen Demand | 388 mg/L | 120 mg/L | South Outfall |
| 12/12/2011 | Chemical Oxygen Demand | 354 mg/L | 120 mg/L | South Outfall |
| 10/5/2011 | Chemical Oxygen Demand | 1170 mg/L | 120 mg/L | South Outfall |
| 2/8/2013 | Copper | 0.085 mg/L | 0.0156 mg/L | South Outfall |
| 12/12/2011 | Copper | 0.06 mg/L | 0.0156 mg/L | South Outfall |
| 10/5/2011 | Copper | 0.185 mg/L | 0.0156 mg/L | South Outfall |
| 2/5/2010 | Copper | 0.123 mg/L | 0.0156 mg/L | South Outfall |
| 2/8/2013 | Iron | 5.3 mg/L | 1.0 mg/L | South Outfall |
| 12/12/2011 | Iron | 2.31 mg/L | 1.0 mg/L | South Outfall |
| 10/5/2011 | Iron | 6.31 mg/L | 1.0 mg/L | South Outfall |
| 2/8/2013 | Lead | 0.248 mg/L | 0.095 mg/L | South Outfall |
| 10/5/2011 | Lead | 0.148 mg/L | 0.095 mg/L | South Outfall |
| 10/5/2011 | Total Organic Carbon | 235 mg/L | 110 mg/L | South Outfall |
| 2/5/2010 | Total Organic Carbon | 150 mg/L | 110 mg/L | South Outfall |
| 2/8/2013 | Total Suspended Solids | 195 mg/L | 100 mg/L | South Outfall |
| 10/5/2011 | Total Suspended Solids | 114 mg/L | 100 mg/L | South Outfall |
| 2/8/2013 | Zinc | 1.06 mg/L | 0.13 mg/L | South Outfall |
| 12/12/2011 | Zinc | 0.84 mg/L | 0.13 mg/L | South Outfall |
| 10/5/2011 | Zinc | 3.14 mg/L | 0.13 mg/L | South Outfall |
| 2/5/2010 | Zinc | 0.513 mg/L | 0.13 mg/L | South Outfall |

The information in the above table reflects data gathered from Cal Micro's self-monitoring during the 2008-2009, 2009-2010, 2010-2011, 2011-2012 and 2012-2013 wet seasons. CCAEJ alleges that during each of those rainy seasons and continuing through today, Cal Micro has discharged storm water contaminated with pollutants that exceed one or more applicable EPA Benchmarks, including, but not limited to, each of the following:

- Aluminum – 0.75 mg/L, MSGP at 102;

- Chemical Oxygen Demand – 120 mg/L, *id.*;

- Copper – 0.0156 mg/L, *id.*;

- Iron – 1.0 mg/L, *id.*;

- Lead – 0.095 mg/L, *id.*;

- Total Organic Carbon – 110 mg/L;

- Total Suspended Solids – 100 mg/L, MSGP at 102; and

- Zinc – 0.13 mg/L, *id.* at 52, 102.

CCAEJ's investigation, including its review of Cal Micro's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards and the EPA's benchmark values, indicate that Cal Micro has not implemented BAT and BCT at the facility for its discharges of Aluminum, Chemical Oxygen Demand, Copper, Iron, Lead, Total Organic Carbon, Total Suspended Solids, Zinc and other pollutants in violation of Effluent Limitation B(3) of the General Permit. Cal Micro was required to have implemented BAT and BCT by no later than October 1, 1992, or since the date the Facility opened. Thus Cal Micro is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed in the table above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CCAEJ alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since at least December 6, 2008 and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CCAEJ alleges that Cal Micro has discharged storm water containing impermissible levels of Aluminum, Chemical Oxygen Demand, Color, Copper, Iron, Lead, Oil & Grease, Total Organic Carbon, Turbidity, Zinc and other pollutants in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.[4]

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions

---

[4] The rain dates are all the days when an average of 0.1" or more rain fell as measured by a weather station located in Pomona, as well as comparing this data to the reported observations from the rain gauge at the Facility.

brought pursuant to the CWA, Cal Micro is subject to penalties for violations of the General Permit and the Act since December 6, 2008.

      **b.**     **Failure To Develop And Implement An Adequate Monitoring And Reporting Program.**

      Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

      The above-referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by Cal Micro is not representative of the quality of the Facility's various storm water discharges and that the Facility failed to monitor all qualifying storm water discharges, CCAEJ alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit.

      **c.**     **Failure To Analyze For Mandatory Parameters.**

      With some limited adjustments, facilities covered by the General Permit must sample two storm events per season from each of their storm water discharge locations. General Permit Section B(5)(a). Collected samples must be analyzed for Total Suspended Solids, pH, Specific Conductance and either Total Organic Carbon or O&G. *Id.* at Section B(5)(c)(i). Facilities must also analyze their storm water samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities," including copper, lead, zinc, aluminum, chemical oxygen demand, and iron. *Id.* at Section B(5)(c)(ii); MSGP at 52, 102.

      CCAEJ's investigation of the Cal Micro's monitoring data indicates that you have failed to analyze for Copper, Lead, Zinc, Iron, Aluminum, Chemical Oxygen Demand, and pH during the 2009-2010 wet season.

      Each failure to analyze for mandatory parameters constitutes a separate violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, Cal Micro is subject to penalties for violations of the General Permit and the Act since December 6, 2008.

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page **12** of **15**

---

   d.     **Failure To Prepare, Implement, Review and Update An Adequate Storm
          Water Pollution Prevention Plan.**

    Section A and Provision E(2) of the General Industrial Storm Water Permit require
discharges of storm water associated with industrial activity to develop, implement, and update
an adequate storm water pollution prevention plan (hereinafter **"SWPPP"**) no later than October
1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant
to the General Permit to continue following their existing SWPPP and implement any necessary
revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

    The SWPPP must, among other requirements, identify and evaluate sources of pollutants
associated with industrial activities that may affect the quality of storm and non-storm water
discharges from the facility and identify and implement site-specific best management practices
(hereinafter **"BMPs"**) to reduce or prevent pollutants associated with industrial activities in
storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The
SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP
must include: a description of individuals and their responsibilities for developing and
implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility
boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location
of the storm water collection, conveyance and discharge system, structural control measures,
impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity
(General Permit, Section A(4)); a list of significant materials handled and stored at the site
(General Permit, Section A(5)); a description of potential pollutant sources including industrial
processes, material handling and storage areas, dust and particulate generating activities, a
description of significant spills and leaks, a list of all non-storm water discharges and their
sources, and a description of locations where soil erosion may occur (General Permit, Section
A(6)).

    The SWPPP also must include an assessment of potential pollutant sources at the Facility
and a description of the BMPs to be implemented at the Facility that will reduce or prevent
pollutants in storm water discharges and authorized non-storm water discharges, including
structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7),
(8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where
necessary (General Permit, Section A(9),(10)).  The SWPP must also include a certification
statement and signature (General Permit, Section C(10)).

    CCAEJ's investigation of the conditions at the Facility as well as Cal Micro's Annual
Reports indicates that Cal Micro has been operating with an inadequately developed SWPPP in
violation of the requirements set forth above.  Cal Micro has failed to evaluate the effectiveness
of its BMPs and to revise its SWPPP as necessary.  Cal Micro has been in continuous violation
of Section A and Provision E(2) of the General Permit every day since December 5, 2008, at the

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page 13 of 15

very latest, and will continue to be in violation every day that Cal Micro fails to prepare, implement, review, and update an effective SWPPP.  Cal Micro is subject to penalties for violations of the Order and the Act occurring since December 6, 2008.

      e.    **Failure To Implement Storm Water Best Management Practices.**

      Provision E(2) as well as Sections A(1), A(9), A(10)(c), and A(10)(d) of the General Permit require that a facility implement BMPs adopted in their SWPPP "when industrial activities begin," "prior to any changes in industrial activity at the Facility," and at most within 90 days of any revisions to the SWPPP.  Moreover, if a facility determines that any part of the SWPPP is infeasible to implement by the deadlines, a facility is required to report this to the Regional Board "prior to the applicable deadline."

      CCAEJ's investigation of the conditions at the Facility as well as the City of Ontario's Stormwater Program Inspection Reports indicates that Cal Micro has consistently failed to implement BMPs adopted as part of their SWPPP.  Inspections by the City of Ontario shows that Cal Micro has failed to implement both non-structural and structural BMPs that are outlined in its SWPPP, including sweeping of trash and debris and installation of storm water treatment controls.  City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Jan. 3 2013); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Sept. 19 2011); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Oct. 25 2010); City of Ontario Stormwater Program, Industrial Facility Inspection Report, File No. Brooks St W 1541 and 1525 (Dec. 11 2009).

      f.    **Failure To File True And Correct Annual Reports.**

      Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  General Permit, Sections B(14), C(9), C(10).  Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

      For the last five years, Cal Micro and its agents, Mike Easterbrook, Ruuhwa Dann and Puneet Gupta, inaccurately certified in their Annual Reports that the Facility was in compliance with the General Permit.  Consequently, Cal Micro has violated Sections A(9)(d), B(14), C(9) and C(10) of the General Industrial Storm Water Permit every time Cal Micro failed to submit a complete or correct report and every time Cal Micro or its agents falsely purported to comply with the Act.  Cal Micro is subject to penalties for violations of Section (C) of the General

Cal Micro– Clean Water Act Notice of Violations & Intent to File Suit
December 6, 2013
Page 14 of 15

Industrial Storm Water Permit and the Act occurring since December 6, 2008.

### III.   Persons Responsible For the Violations.

CCAEJ puts Cal Micro Recycling, Ruuhwa Dann & Associates, Inc., Mike Easterbrook, Ruuhwa Dann, and Puneet Gupta on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CCAEJ puts Cal Micro Recycling, Ruuhwa Dann & Associates, Inc., Mike Easterbrook, Ruuhwa Dann, and Puneet Gupta on notice that it intends to include those persons in this action.

### IV.   Name And Address Of Noticing Parties.

The name, address and telephone number of CCAEJ is as follows:

Center for Community Action and Environmental Justice
P.O. Box 33124
Jurupa Valley, CA 92519
Tel. (951) 360-8451

### V.   Counsel.

CCAEJ has retained counsel to represent it in this matter.  Please direct all communications to:

Gideon Kracov
Mitchell M. Tsai
The Law Office of Gideon Kracov
801 South Grand Avenue
11th Floor
Los Angeles, California 90017
Tel: (213) 629-2071
E-Mail: gk@gideonlaw.net
E-Mail: mmt@gideonlaw.net

Michael R. Lozeau
Douglas J. Chermak
Lozeau Drury LLP
410 12th Street
Suite 250
Oakland, California 94607
Tel: (510) 836-4200
E-Mail: michael@lozeaudrury.com
E-Mail: doug@lozeaudrury.com

### VI.   Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Cal Micro to a penalty of up to $32,500.00 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit through January 12, 2009, and a maximum of $37,500 per day per violation for all violations occurring after January 12, 2009.  In addition to civil penalties, CCAEJ will seek

injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CCAEJ believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  CCAEJ intends to file a citizen suit under Section 505(a) of the Act against Cal Micro and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, CCAEJ would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, CCAEJ suggests that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  CCAEJ does not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Mitchell M. Tsai
The Law Office of Gideon Kracov
Attorneys for Center for Community Action and
Environmental Justice

## SERVICE LIST

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
12000 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jared Blumenfeld, Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA 94105

Kurt V. Berchtold, Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street
Suite 500
Riverside, CA 92501-3348

*Served via Certified Mail, Return Receipt Requested.

## ATTACHMENT A

Rain Dates, Cal Micro, Ontario, California

| | | |
|---|---|---|
| 11/26/2008 | 12/15/2008 | 12/16/2008 |
| 12/17/2008 | 12/25/2008 | 2/5/2009 |
| 2/6/2009 | 2/7/2009 | 2/8/2009 |
| 2/9/2009 | 2/13/2009 | 2/16/2009 |
| 11/30/2009 | 12/6/2009 | 12/7/2009 |
| 12/16/2009 | 12/29/2009 | 1/3/2010 |
| 1/4/2010 | 1/5/2010 | 1/7/2010 |
| 1/9/2010 | 1/10/2010 | 2/7/2010 |
| 2/8/2010 | 2/12/2010 | 2/14/2010 |
| 2/17/2010 | 2/19/2010 | 2/20/2010 |
| 2/21/2010 | 2/22/2010 | 2/23/2010 |
| 2/25/2010 | 2/27/2010 | 2/28/2010 |
| 3/1/2010 | 3/2/2010 | 3/5/2010 |
| 3/15/2010 | 3/17/2010 | 11/30/2010 |
| 12/6/2010 | 12/7/2010 | 12/16/2010 |
| 1/3/2011 | 1/4/2011 | 1/5/2011 |
| 1/7/2011 | 1/9/2011 | 1/10/2011 |
| 2/7/2011 | 2/8/2011 | 2/12/2011 |
| 2/14/2011 | 2/17/2011 | 2/19/2011 |
| 2/20/2011 | 2/21/2011 | 2/22/2011 |
| 2/23/2011 | 2/25/2011 | 2/27/2011 |
| 2/28/2011 | 3/1/2011 | 3/2/2011 |
| 3/5/2011 | 3/15/2011 | 3/17/2011 |

| | | |
|---|---|---|
| 11/30/2011 | 12/6/2011 | 12/7/2011 |
| 12/16/2011 | 12/29/2011 | 1/3/2012 |
| 1/4/2012 | 1/5/2012 | 1/7/2012 |
| 1/9/2012 | 1/10/2012 | 2/7/2012 |
| 2/8/2012 | 2/12/2012 | 2/14/2012 |
| 2/17/2012 | 2/19/2012 | 2/20/2012 |
| 2/21/2012 | 2/22/2012 | 2/23/2012 |
| 2/25/2012 | 2/27/2012 | 2/28/2012 |
| 2/29/2012 | 3/1/2012 | 3/2/2012 |
| 3/5/2012 | 3/15/2012 | 3/17/2012 |
| 11/30/2012 | 12/6/2012 | 12/7/2012 |
| 12/16/2012 | 12/29/2012 | 1/3/2013 |
| 1/4/2013 | 1/5/2013 | 1/7/2013 |
| 1/9/2013 | 1/10/2013 | 2/7/2013 |
| 2/8/2013 | 2/12/2013 | 2/14/2013 |
| 2/17/2013 | 2/19/2013 | 2/20/2013 |
| 2/21/2013 | 2/22/2013 | 2/23/2013 |
| 2/25/2013 | 2/27/2013 | 2/28/2013 |
| 3/1/2013 | 3/2/2013 | 3/5/2013 |
| 3/15/2013 | 3/17/2013 | 11/30/2013 |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Virginia A. Phillips_____ and the assigned Magistrate Judge is _____Sheri Pym_____ .

The case number on all documents filed with the Court should read as follows:

### EDCV14-230-VAP(SPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____February 5, 2014_____
Date

By  C. Sawyer
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☐ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☐ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☒ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Center for Comunity Action and Environmental Justice

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Ruuhwa Dann & Associates, Inc. dba Cal Micro Recycling

**(b)** County of Residence of First Listed Plaintiff    Riverside
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Bernardino
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

Gideon Kracov, 801 S. Grand Av., 11th Fl., LA, CA 90017 213-629-2071
Michale Lozeau, Douglas Chermak, Lozeau | Drury LLP, 410 12th St., #250, Oakland, CA 94607 510-836-4200

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding     ☐ 2. Removed from State Court     ☐ 3. Remanded from Appellate Court     ☐ 4. Reinstated or Reopened     ☐ 5. Transferred from Another District (Specify)     ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal Water Pollution Control Act, 33 USC section 1251 et seq. / action to enforce federal permit requirements under Clean Water Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | ☐ 530 General | | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☒ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:**    Case Number:     ED   CV14-0230

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? ☐ Yes ☒ No  If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? ☐ Yes ☒ No  If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?  Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?  Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1.  Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.  Is either of the following true? If so, check the one that applies:**

☒ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Eastern |

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____   DATE: 2/5/14

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |